John K. FREEMAN, Plaintiff–Appellant, Cross–Appellee,

v.

SPORTS CAR CLUB OF AMERICA, INC., Defendant–Appellee, Cross–Appellant.

Nos. 94–3251, 94–3337.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1995.

Decided April 13, 1995.

---

Bryce H. Bennett, Jr. (argued) and Charles P. Edwards, Riley, Bennett & Egloff, Indianapolis, IN, for plaintiff.

Michael A. Wukmer, Ice, Miller, Donadio & Ryan, Indianapolis, IN and Kelly J. Smith (argued), Wheat Ridge, CO, for defendant.

Before CUMMINGS, CUDAHY and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

John Freeman, a certified public accountant by trade, appears passionately devoted to two hobbies: sports car racing and federal litigation. The present case is the third chapter in his ongoing effort to combine these two pursuits. On December 22, 1992, Freeman sued the Sports Car Club of America, Inc. ("SCCA") for failing to reinstate his racing license following his second six-month suspension. The district court granted summary judgment for SCCA. Freeman, not surprisingly, appeals, and SCCA appeals the denial of its counterclaim seeking damages under the non-litigation provision of its General Competition Rules ("GCR").

## I. Background

SCCA, a Connecticut not-for-profit corporation with its principal place of business in Englewood, Colorado, is a 50,000–member organization of sports car enthusiasts and road racers. Membership in the organization is a prerequisite for obtaining an SCCA racing license and competing in SCCA-sponsored events.

SCCA's large grassroots program of amateur club road racing is governed by rules collected in the GCR. Detailed regulations prescribe specifications for the cars that can compete in various classes and promulgate standards for driver conduct and meet organization as well as for disciplinary and appeals procedures. Competitors who violate these rules are assessed penalty points, and those who accumulate a certain number of points in a fixed time period face mandatory suspension of their racing licenses.

A summary of Freeman's history in the SCCA will place the present lawsuit in the proper context. Freeman began competing in SCCA amateur races in the mid 1980s. In 1988 Freeman started a business, Sports Racing Services ("SRS"), buying and selling race cars and parts. SRS entered into a contract with SCCA's wholly owned subsidiary, SCCA Enterprises, Inc. ("Enterprises"), which builds and sells "Spec Racers" to compete in their own class in SCCA events.[1] The contract authorized SRS to resell and service Spec Racers as a customer service representative for Enterprises.

During the time Freeman owned and operated SRS, he continued to compete in SCCA-sanctioned races. On September 30, 1990, Freeman was charged with "reckless or dangerous driving," a violation of § 20.1.4 of the GCR, and was assessed a six-event probation. The Steward of the Meet ("SOM")

upheld Freeman's probation as did the SCCA National Court of Appeals which heard the appeal even though it was not timely filed.

In January 1991, Enterprises canceled its agreement with SRS under a provision of the contract allowing termination by either party upon 30 day's notice. On February 28, 1991, SRS and Freeman sued SCCA and Enterprises among others. Although the details of the litigation, which Freeman refers to ominously as the "antitrust suit," are not clear from this record, it appears that Freeman charged SCCA and Enterprises with violations of federal antitrust laws based on provisions of the GCR relating to the Spec Racer and "Shelby Can Am," another single-car, single-maker class sanctioned by the SCCA. The case was transferred to the District Court of Colorado which granted summary judgment in favor of all of the defendants.[2]

Back on the racing front, Freeman continued to rack up penalties. On April 28, 1991, he was assessed a two-lap penalty when an inspector found the track width on his Mitsubishi Mirage showroom stock racer to be out of specification. The SOM upheld the decision and Freeman did not appeal. On May 25, 1991, Freeman was again penalized for his showroom stock car's failure to conform to specification.

On June 5, 1991, Freeman brought his second lawsuit against the SCCA in the district court for the Southern District of Indiana. On the same day he obtained an *ex parte* temporary restraining order ("TRO") prohibiting the SCCA from "[d]isqualifying or otherwise penalizing plaintiff's 1989 Mitsubishi Mirage from competition in the race scheduled for June 8 and 9, 1991 at Road America, Wisconsin" (the "Road America race").[3]

---

1. By requiring that all the drivers compete with identical cars from a single manufacturer SCCA attempts—through the Spec Racer class—to achieve competitive, affordable racing.

2. Freeman and SRS appealed the summary judgment order. We were told at oral argument that the Tenth Circuit has recently dismissed the appeal for lack of appellate jurisdiction because of the district court's failure to dispose of a counterclaim filed by Enterprises.

3. The details of the second suit are again hazy from this record. It appears similar to the present suit in that Freeman sought to enjoin the SCCA from penalizing his car or suspending his license. On August 14, 1991, Judge Tinder dismissed the suit for lack of subject matter jurisdiction when plaintiff failed to establish the required amount in controversy.

Freeman subsequently competed in the Road America race with the TRO taped to the rear driver's side window of his race car, dropping out with mechanical problems after four laps. Following a protest by another competitor, Freeman's car was inspected and its track width found to be out of specification. Once again, Freeman received penalty points for entering a non-complying race car. Freeman did not appeal this decision.

On June 15, 1991, Freeman received verbal reprimands for several other GCR violations. On July 7, 1991, Freeman was disqualified from a race and assessed penalty points for passing under a yellow flag. Freeman appealed this decision so the penalty points were not charged against his license until August 8, 1991, when the SCCA's National Court of Appeals upheld the decision of the SOM. On July 9, 1991, while the appeal was pending and before this last set of penalty points was assessed, the SCCA Licensing Department asked Freeman to return his competition license and to serve a six-month mandatory suspension because of his accumulation of penalty points. On September 9, 1991, the SCCA received Freeman's license which triggered the start of his six-month suspension.

On March 9, 1992, Freeman's license was reinstated. On April 26, 1992, however, Freeman was once again disqualified from a race and assessed penalty points for entering his out-of-specification Mitsubishi. Freeman appealed this decision and the penalty points were not assessed until the SCCA National Court of Appeals ruled against him on May 27, 1992. These points, along with those assessed in August 1991, led to another six-month suspension of Freeman's competition license.

The SCCA received Freeman's license on June 4, 1992, making him eligible for reinstatement on December 4, 1992. On December 13, 1992, Freeman wrote to SCCA's Licensing Department requesting reinstatement. Freeman's request was forwarded to SCCA's Competition Board, which held telephonic meetings beginning December 21, 1992, to discuss whether Freeman's license should be reinstated. On December 22, 1992, Freeman filed the present action seeking, among other relief, a TRO requiring that SCCA immediately reinstate his license. On December 23, 1992, not yet aware of the most recent lawsuit, the Competition Board voted to revoke Freeman's racing license pursuant to GCR § 14.6.3. This provision permits the Competition Board permanently to revoke a driver's license if the driver acts contrary to the best interests of SCCA. The Competition Board's action was spurred by Freeman's multiple attempts to litigate SCCA rule decisions in violation of § 3.9.1. of the GCR which bars such litigation. The Competition Board notified Freeman that he could appeal this decision to the National Court of Appeals and/or apply for reinstatement in six months. Freeman instead proceeded with this lawsuit.

On September 1, 1993, the SCCA's Board of Directors voted to hold a hearing to determine whether to expel Freeman from membership. The Board of Directors held a hearing on December 2, 1993, which Freeman attended with counsel. The next day, Freeman was expelled from the organization.

## II. Procedural History and Lower Court Disposition

Freeman's verified complaint for damages and injunctive relief filed December 22, 1992, contains three counts. In Count I, Freeman alleges that SCCA's articles of incorporation, by-laws, and rules create a binding contract between the association and its members. Freeman further alleges that SCCA breached its own rules and thus the contract between SCCA and Freeman when it failed to reinstate his license.

In Count II, Freeman alleges that SCCA denied him due process by violating its own rules requiring notice and a hearing before revoking his license.

In Count III, Freeman alleges that by assessing penalty points against him during the Road America races the SCCA violated the *ex parte* TRO granted in his earlier lawsuit.

Each count incorporates by reference "rhetorical paragraph 10" which states that "Defendant has failed to reinstate Plaintiff's license perhaps in retaliation against Free-

man for filing suit against the Defendant for violations of federal antitrust law."

On January 5, 1993, SCCA filed its answer and a counterclaim seeking damages against Freeman for initiating this lawsuit in breach of § 1.2.4 of the GCR, which states that decisions of SCCA officials are non-litigable. On February 12, 1993, SCCA filed a motion to dismiss for lack of subject matter jurisdiction and an alternative motion for summary judgment. Finally on August 5, 1994, after much jousting and the recusal, at Freeman's request, of the original trial judge, Judge McKinney granted summary judgment for SCCA on all three of Freeman's counts and for Freeman on SCCA's counterclaim.

Judge McKinney found that because the provisions of the GCR requiring notice and hearing before a penalty is assessed apply only to decisions of the SOM and not to discretionary decisions made by the Competition Board, SCCA did not violate its own rules when it revoked Freeman's license. Because SCCA did not violate its own rules it neither breached its contract with Freeman nor denied him process due under the rules. As to Count III, Judge McKinney found that in assessing penalty points against Freeman after allowing him to compete, the SCCA did not violate the terms of the *ex parte* TRO. In denying SCCA's counterclaim Judge McKinney held that the GCR non-litigation provision was not enforceable, citing the common law rule against enforcing agreements which divest a court of jurisdiction.[4]

On appeal, Freeman does not challenge the district court's holdings with respect to his first and third counts. He challenges instead the district court's interpretation of his second count, namely the court's failure "to decide if SCCA violated Freeman's fundamental right to due process" (Pl.Br. 2). Freeman also challenges the district court's failure "to decide if SCCA acted unlawfully by retaliating against Freeman for filing an antitrust action against SCCA." Freeman's final contentions on appeal relate to the district court's failure to address the SCCA's expulsion of Freeman from membership.

SCCA cross-appeals the denial of their counterclaim.

## III. Discussion

### A. Jurisdiction

 This is a diversity action. SCCA challenges Freeman's assertion that the damages flowing from the revocation of his amateur racing license exceed $50,000. For his part, Freeman claims losses of hundreds of thousands of dollars in potential sponsorship and prize money, and says that he has had to write off all of his cars and equipment. We note that markets obviously exist for Freeman's cars and equipment and are sympathetic to SCCA's contention that Freeman's estimates of lost prize money and future sponsorship are rather hopeful to say the least. To dismiss a diversity case for lack of jurisdiction, however, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Sharp Elecs. Corp. v. Copy Plus, Inc.*, 939 F.2d 513, 515 (7th Cir.1991). When a party is seeking injunctive relief, the value to the plaintiff of the right he is seeking to protect is determinative. *Burns v. Massachusetts Mut. Life Ins. Co.*, 820 F.2d 246, 248 (8th Cir.1987). Therefore, SCCA can only prevail in its argument for dismissal by establishing to a legal certainty that Freeman does not value his SCCA license at more than $50,000. Given the amount of time and money Freeman has expended in litigation, that is a high hurdle which SCCA has not succeeded in clearing.

### B. Direct Appeal

 The second count of Freeman's complaint alleging a due process violation has taken on a chameleon character as this litigation has progressed. At a hearing in this action held January 5, 1993, Freeman's counsel repeatedly claimed that SCCA's actions were "unconstitutional" (Tr. 78) and that members "should not and cannot give up their rights to due process and to justice under the laws of the United States of America" (Tr. 70). When questioned by the court as to whether he was attempting to claim a violation of constitutional due process, Free-

---

4. Freeman subsequently filed a motion for reconsideration and/or clarification of judgment which

Judge McKinney denied in an order dated January 19, 1995.

man's counsel retreated, stating that the claim involved an asserted breach of Freeman's rights to basic due process as outlined in the rules of the GCR. The district court ruled against Freeman on this theory. Freeman now argues that he was in fact alleging a violation of common law due process rights which do not depend on the rules of the SCCA.

Arguably, Freeman has waived this argument; regardless, it fails on the merits.[5] The right of the SCCA, as a private association, to interpret and administer rules "is as sacred as the right to make them." *Givens v. Superior Court of Marion County*, 233 Ind. 235, 117 N.E.2d 553, 554 (1954). Courts in Indiana will interfere with this right only in very limited circumstances. "The jurisdiction and power of courts of equity to issue restraining orders is limited to the protection of civil and property rights." *Id.*

The revocation of Freeman's racing license involved neither a property right nor the right to make a living. Whatever his aspirations, Freeman's complaint involves amateur racing, a hobby—an expensive hobby but a hobby nonetheless. Moreover, it is not a hobby over which SCCA holds monopolistic control. If Freeman did not want to play by the SCCA's rules his proper recourse was to race elsewhere. Freeman in fact did race elsewhere: in 1992 he competed in races governed by three other sanctioning bodies.

Freeman cites *Terrell v. Palomino Horse Breeders of America*, 414 N.E.2d 332 (Ind. App.1980), for the proposition that Indiana courts will enforce the "fundamental due process rights" of members in a voluntary association. His reliance is misplaced. In *Terrell* an Indiana appeals court upheld the one-year suspension of a member of the Palomino Horse Breeders association following a "re-trial" ordered by the court because the first suspension proceeding did not comport with the organization's own rules. Any language in that opinion implying the existence of basic due process rights beyond those provided in the association's rules and by-laws is thus

dicta. Moreover, *Terrell* concerned the right to make a living—membership was required to conduct Palomino breeding business—and was thus a more compelling case for court intervention.

Freeman's reliance on *Crane v. IHSAA*, 975 F.2d 1315 (7th Cir.1992), is equally unavailing. In *Crane* a split panel of this Court intervened in a decision of the Indiana High School Athletic Association ("IHSAA") and found that the association interpreted and applied its rules in an arbitrary and capricious manner when it denied varsity golf eligibility to a high school student who moved between his divorced parents. Though the Court claimed to be applying Indiana law of voluntary associations, IHSAA is a state actor and the Indiana Supreme Court has held its actions to be judicially reviewable, *Haas v. South Bend Community School Corp.*, 259 Ind. 515, 289 N.E.2d 495, 498 (1972).[6] Moreover, for a student athlete in public school, membership in IHSAA is not voluntary, and actions of the IHSAA arguably should be held to a stricter standard of judicial review. But even if the Court correctly applied Indiana law in finding the IHSAA's decision reviewable where no civil or property right was involved (a position with which Judge Posner, dissenting, took issue), the decision is distinguishable from the present case. The majority in *Crane* found IHSAA's actions arbitrary only because the association repeatedly gave different and inconsistent interpretations of its own rule and the reasons for the student's ineligibility under that rule. The Court acknowledged that, "[i]f IHSAA Rule 19–6.1 was unambiguous or if the IHSAA interpreted and applied the rule consistently, no court could interfere." *Id.* at 1325. Freeman does not allege ambiguity in the GCR provisions governing the Competition Board's revocation of his license. Therefore, *Crane* does not support his attempt to have this Court review the Competition Board's decision.

Even if we had the power to interfere, the SCCA did not act arbitrarily in adopting its

**5.** Judge McKinney addressed and dismissed this argument in his order denying Freeman's Motion for Reconsideration and/or Clarification.

**6.** The district court had in fact based its decision on the federal Constitution. The majority did not address the constitutional issue, reaching the same result on state law grounds.

non-litigation provisions nor did the Competition Board in revoking Freeman's license based on his violation of them. In considering whether SCCA acted arbitrarily when it adopted its non-litigation provisions, we note that it is not uncommon for auto racing sanctioning bodies to require that rule decisions be non-litigable. See *Crouch v. National Ass'n for Stock Car Auto Racing*, 845 F.2d 397 (2d Cir.1988). More importantly for present purposes, the GCR included nonrecourse provisions before Freeman filed his first lawsuit against the SCCA.[7] Freeman cannot claim, therefore, that they constitute arbitrary, capricious, or retaliatory action by the SCCA aimed at him. Though it is true that the non-litigation provisions added to the GCR in 1992 are more explicit, it was Freeman's violation of the earlier provisions (3.9.1.B. and 3.9.1.C.) which the Competition Board cited in its letter revoking his license. Therefore, whether or not the 1992 rule changes were motivated by Freeman's appetite for litigation is irrelevant.

If we had any doubt, Count III of Freeman's complaint convinces us that the Competition Board's determination that Freeman's lawsuits were contrary to the best interests of the SCCA was neither arbitrary nor capricious. In Count III, Freeman seeks damages for SCCA's alleged violation of his *ex parte* TRO restraining the SCCA from disqualifying or penalizing his Mitsubishi during the Road America race. Freeman claims that SCCA "purposefully violated that Order by inspecting Plaintiff's car and allegedly determining that it did not meet certain specifications for its class."

SCCA could not continue to put on races if participants were able, as Freeman was, to obtain orders specifically exempting them from all competition and safety rules. Freeman underscores the absurdity of his position when he claims damages even though SCCA allowed him to compete in a car which violated the class specifications. It was fortunate for the other competitors that he suffered a mechanical failure. What if he had won with his illegal car which could not be disqualified because of the TRO taped to the rear window? Would SCCA have to provide two trophies—the "Freeman Cup" and another for the legitimate winner who did not cheat under cover of court order? What if the SCCA inspection had disclosed that Freeman's car was unsafe? Under the terms of the TRO they could not have prevented him from running without risking contempt. This is absurd. Courts and amateur auto racing do not mix. As the *Terrell* court said:

> Voluntary associations clearly have the right of self-preservation. Implicit in that right is the power of an organization, at a minimum, to suspend or expel members who violate that organization's rules or commit acts which threaten the essential purpose for which the association was formed.

*Terrell*, 414 N.E.2d at 388. We find no fault in the Competition Board's actions.

---

7. The version of the GCR effective beginning January 1, 1990 contains the following provision:

3.9.1 Every person, body, group of persons, region of the SCCA, or organizer who applies for and is granted an SCCA sanction to conduct an event, or any person who applies for an SCCA license shall be deemed to have agreed to the following and so acknowledge in writing upon request:

A. He or she is familiar with the GCR.

B. He or she agrees without reservation to the consequences resulting from the GCR.

C. He or she renounces the right to have recourse, except with the written consent of the SCCA, to any arbitrator or tribunal not provided for in the GCR.

The following addition to provision 1.2.4 became effective January 2, 1992:

The interpretation and application of the SCCA General Competition Rules by SCCA officials shall be final and binding. In order to promote the sport of automobile competition, to achieve prompt finality in competition results, and in consideration of the numerous benefits to them, all members, including competitors and officials, expressly agree that:

A. Determinations by SCCA officials are nonlitigable;

B. They will not initiate or maintain litigation of any kind against SCCA or anyone acting on behalf of SCCA to reverse or modify such determinations, or seek to recover damages or other relief allegedly incurred or required as a result of such determination; and

C. If a member, competitor, or official initiates or maintains litigation in violation of this provision, that member, competitor or official agrees to reimburse SCCA for all costs of such litigation, including travel expenses and attorney's fees.

Freeman also argues that regardless of SCCA's rules, he had a fundamental right to notice and a hearing before his license was revoked. If Freeman had such a right, he waived it. Freeman was notified of his right to appeal his license revocation in a letter from the Competition Board. Not only would he have had an opportunity to be heard on appeal, but the revocation would have been stayed pending the outcome of the appeal. The general rule requiring exhaustion of administrative remedies as a prerequisite to judicial relief applies with equal if not greater force to the administration of voluntary associations. See *United States Auto Club, Inc. v. Woodward*, 460 N.E.2d 1255 (Ind.App.1984).

Freeman's final contentions on appeal involve the district court's failure to address SCCA's expulsion of Freeman from membership on December 4, 1993, while his action was pending in the district court. The district court did not rule on these issues because they are not in his complaint and Freeman never requested leave to supplement his complaint to include them. Freeman now claims that the district court erred in not ordering him to supplement his complaint to include these issues. This is an interesting approach to litigation but not the one adopted by courts in this country. In our system, the plaintiff as the master of his own suit must decide himself which events and legal theories to include in his complaint. Freeman failed to do either.

Unfortunately, perhaps anticipating our result, Freeman has already filed a fourth suit in the district court based on his expulsion from membership. Given the admitted facts that he received both notice and hearing before this action was taken by the SCCA, the disposition of that suit will hopefully not require a great deal more of the resources of the federal courts or the SCCA.

### C. Counterclaim

SCCA's counterclaim seeks damages including attorneys' fees and other litigation costs resulting from Freeman's violation of the GCR's non-recourse provisions. We affirm the district court's dismissal of this claim, but not because the non-recourse provision violates public policy. Rather, the policy of court non-interference in the affairs of voluntary associations cuts both ways. Courts should no more enforce the SCCA's rules against Freeman than they should enforce Freeman's rights against the SCCA. If the SCCA finds that Freeman has violated its non-recourse rules, as it has, it can penalize or expel him, as it has. If the SCCA wants to condition the reinstatement of Freeman's license on his reimbursement of its legal expenses, it can do that too. What it cannot do is have this court enforce its rules.

SCCA's claim that members are contractually bound by every provision in the multi-hundred page GCR is equally unpersuasive. Moreover, the explicit non-litigation provision whereby members purportedly agree to reimburse SCCA's litigation expenses was not added until 1992 and it is undisputed in the record that Freeman was unaware of the provision when he filed his lawsuit. The constructive knowledge of the rules that SCCA assumes of its members does not supplant the requirement of an actual meeting of the minds for the formation of a legally enforceable contract.

### IV. Conclusion

Judgment of the district court is affirmed.