In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4028

Donald C. Austin,

Plaintiff-Appellant,

v.
American Association of
Neurological Surgeons,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 7685--Elaine E. Bucklo, Judge.

Argued April 9, 2001--Decided June 12, 2001


  Before Posner, Evans, and Williams, Circuit
Judges.

  Posner, Circuit Judge. Donald C. Austin,
a neurosurgeon, was suspended for six
months by the American Association of
Neurological Surgeons, a voluntary
association incorporated under Illinois
law as a not-for-profit corporation, to
which he belonged (he has since
resigned). He brought this suit against
the Association claiming that he had been
suspended in "revenge" for having
testified as an expert witness for the
plaintiff in a medical malpractice suit
brought against another member of the
Association, a Dr. Ditmore. Austin argues
that the suspension violated Illinois law
(federal jurisdiction is based on the
parties' being citizens of different
states) and seeks damages measured by the
decline in his expert-witness income as a
consequence of the suspension. He also
seeks an injunction expunging the record
of the suspension, but he does not seek
reinstatement to membership.

  Ordinarily a dispute between a voluntary
association and one of its members is
governed by the law of contracts, the
parties' contractual obligations being
defined by the charter, bylaws, and any
other rules or regulations of the associ
ation that are intended to create legally
enforceable obligations. See, e.g., Head

v. Lutheran General Hospital, 516 N.E.2d 921, 927 (Ill. App. 1987); Perkaus v. Chicago Catholic High School Athletic League, 488 N.E.2d 623, 627 (Ill. App. 1986); Dawkins v. Walker, No. 1991712, 2001 WL 259285, at *5 (Ala. March 16, 2001); Robinson v. Kansas State High School Activities Ass'n, Inc., 917 P.2d 836, 844 (Kan. 1996); 2 Marilyn E. Phelan, Nonprofit Enterprises: Corporations, Trusts, and Associations sec. 14:03, p. 14-12 (2000). Austin does not argue that in suspending him the Association was violating any of its contractual obligations to him. But recognizing that membership in good standing in a professional association may be essential to a professional's livelihood, Illinois like other states has conferred additional legal rights on members of voluntary associations (not limited to professional associations). A member who can show that the association's action of which he complains substantially impaired an "important economic interest" of his can base suit on procedural irregularities (denial of "due process") or bad faith as well as on the usual contractual grounds. Van Daele v. Vinci, 282 N.E.2d 728, 731-32 (Ill. 1972); National Assoc. of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp., 779 F.2d 1281, 1285 (7th Cir. 1985) (applying Illinois law); Jacobson v. New York Racing Ass'n, 305 N.E.2d 765, 768 (N.Y. 1973); Falcone v. Middlesex County Medical Society, 170 A.2d 791, 796-97 (N.J. 1961); Freeman v. Sports Car Club of America, Inc., 51 F.3d 1358, 1363 (7th Cir. 1995) (applying Indiana law); NAACP v. Golding, 679 A.2d 554, 562 (Md. App. 1996); 2 Phelan, supra, sec. 14:03, pp. 14-10 to 14-11. The cases add to the list of grounds for such a suit violation of the association's charter or bylaws and contravention of public policy, but the former ground (violation of charter or bylaws) is just another way of assimilating voluntary-association law to contract law (see, besides the cases cited earlier, Van Valkenburg v. Liberty Lodge, 619 N.W.2d 604, 610 (Neb. App. 2000), and Employees' Benefit Ass'n v. Grissett, 732 So. 2d 968, 975 (Ala. 1998))--and the latter too, since illegality is a conventional basis in contract law for rescinding a contract, see, e.g., E. Allan Farnsworth, Contracts sec.sec. 5.1, 5.8 (3d ed. 1999),

including a bylaw or charter provision pursuant to which a member of a voluntary association has been expelled. See, e.g., Crandall v. North Dakota High School Activities Ass'n, 261 N.W.2d 921, 925-26 (N.D. 1978). What "bad faith" adds to the litany of grounds is obscure; it can be regarded either as a component of the due process analysis, analogous to the requirement of an impartial tribunal in an ordinary due process case, or as an implied term in the contract between the association and its members.

There were no procedural irregularities here--Austin received notice and a full hearing (with counsel) before a panel of Association members not implicated in his dispute with Ditmore. The complaint is rather that the Association acted in bad faith because it never disciplines members who testify on behalf of malpractice defendants as distinct from malpractice plaintiffs and that it is against public policy for a professional association to discipline a member on the basis of trial testimony unless the testimony was intentionally false.

Austin had been retained to testify on behalf of a woman whose recurrent laryngeal nerve was permanently damaged in the course of an anterior cervical fusion performed by Dr. Ditmore, resulting in a paralyzed vocal cord, dif ficulty in swallowing, and shortness of breath that ultimately required her to undergo a tracheostomy. An anterior cervical fusion is an operation to repair a herniated spinal disc at the back of the neck. The operation is called "anterior" because the surgeon cuts into the spine from the front, that is, through the neck, being careful to push aside ("retract," in medical lingo) the tissues in front of the spine. According to the testimony that Austin was permitted to give at trial, he believes and "the majority of neurosurgeons" would concur that the plaintiff could not have suffered a permanent injury to her recurrent laryngeal nerve unless Dr. Ditmore had been careless, because she had no anatomical abnormality that might have enabled such an injury to result without negligence on the surgeon's part- -though in the disciplinary hearing it emerged that, because the recurrent laryngeal nerve is difficult to see, and often is not seen during the operation,

it may be impossible to determine whether the particular patient's nerve is unusually susceptible to injury. Austin testified that Ditmore must have rushed the operation (though there was no other evidence of that) and as a result retracted the tissues adjacent to the recurrent laryngeal nerve too roughly. As Ditmore pointed out at the hearing, however, Austin could hardly be considered an expert on anterior cervical fusion, having performed only 25 to 30 of them in more than 30 years in practice, although he had performed a large number of other cervical operations. Ditmore in contrast had performed 700 anterior cervical fusions--with exactly one case of permanent damage to a patient's recurrent laryngeal nerve, namely the case of the patient who had sued him.

Dr. Austin claimed at the hearing that he had based his opinion on an article by a Dr. Ralph Cloward, described by Austin as the "father" of anterior cervical fusion, which had concluded that "serious complications are avoidable and can be prevented by the surgeon adhering strictly to the surgical technique described for" an anterior cervical fusion; and on another article, which Austin did not date, or identify other than by the last name of the author, Wat kins, which states that "the key to prevention of traction injuries to the [recurrent laryngeal] nerve is not to retract vigorously into the soft tissues." Although neither side's lawyer appears to have been aware of the fact, both articles are reprinted in full in the appellate record--in fact twice. The citations are Ralph B. Cloward, "Complications of Anterior Cervical Disc Operation and Their Treatment," 69 Surgery 175, 182 (1971); Robert G. Watkins, "Cervical, Thoracic, and Lumbar Complications--Anterior Approach," in Complications of Spine Surgery 211, 221 (Steven R. Garfin ed. 1989).

Neither article supports Austin's testimony. Cloward was making a general statement of reassurance about the avoid ability of serious complications of his pet operation, not anything specifically to do with the risk of permanent damage to the recurrent laryngeal nerve. Watkins never suggested that all traction injuries to the recurrent laryngeal nerve could be prevented by gentle retraction.

Austin admitted that he hadn't discussed the matter with any other medical professionals. Expert evidence contrary to Austin's was given and the jury returned a verdict for Ditmore. That was in 1995. Ditmore promptly complained to the Association and Austin was suspended in 1997 following a hearing at which he and Ditmore testified, the latter to the effect that Austin had no basis for testifying that most neurosurgeons agreed with his view. This suit followed quickly on the heels of the suspension, and the district court granted summary judgment in favor of the Association.

   Oddly, apart from Cloward's article, and the Watkins article of unknown provenance (unknown to the lawyers, that is), no literature on anterior cervical fusion or injuries to the recurrent laryngeal nerve was presented either to the Association's hearing board or to the district court, although some additional literature had been presented at the malpractice trial and there is an abundance of up-to-date relevant literature easily retrievable from the World Wide Web. There we discover in a cursory search that permanent damage to the recurrent laryngeal nerve is a known though fortunately rare complication of anterior cervical fusion (a 1982 study found only 52 cases of paralysis to the recurrent laryngeal nerve in 70,000 such operations--.07 percent) against which the patient should be warned. See, e.g., informeddecision.com, http://www.informeddecision.com/options/cervical/crvfusna.htm; wvneuro.com, http://www.wvneuro.com/anterior_cervical_fusion_page_1_.htm; headpain.com, http://www.headpain.com/p_acf.htm; neurosurgery.org, http://www.neurosurgery.org/health/patient/detail.asp? DisorderID=36. Asked on cross-examination at the malpractice trial to explain why the medical literature did not confirm his view of what a majority of neurosurgeons think, Austin responded lamely that the "medico-legal atmosphere that we're in these days" had deterred the surgical community from acknowledging that this particular complication of anterior cervical fusion could occur only through the surgeon's negligence.

   But that is an aside, as we do not

understand Austin to be contending that the record is inadequate to support an inference that his testimony was indeed irresponsible. Since neither article on which he relies (for, just as in the disciplinary hearing and in the district court, he cites no other literature in this court) states that permanent injury to the recurrent laryngeal nerve of a patient with a normal neck never occurs without negligence on the part of the surgeon, and since his position if accepted would, by making the surgeon an insurer against any serious mishaps in an anterior cervical fusion, make the operation exceptionally risky in a financial or liability sense for the surgeon, and since Austin plainly had not attempted to sound the opinion of his profession to determine whether a majority of the nation's several thousand neurosurgeons agree with his unorthodox view, there is little doubt that his testimony was irresponsible and that it violated a number of sensible-seeming provisions of the Association's ethical code. These include provisions requiring that a member appearing as an expert witness should testify "prudently," must "identify as such, personal opinions not generally accepted by other neurosurgeons," and should "provide the court with accurate and documentable opinions on the matters at hand."

  The dismissal of Austin's suit was unquestionably correct. To begin with, he failed to show that an "important economic interest," as the Illinois cases interpret the term, is at stake. Membership in the American Association of Neurological Surgeons is not a precondition to the practice of neurosurgery. The AANS is not even the only association of such surgeons, though we were told without contradiction that it is the premier one. Austin continues to practice neurosurgery notwithstanding his suspension and subsequent voluntary resignation from the Association, and he doesn't even seek reinstatement--only damages and expungement of the record of his disciplinary suspension. Indeed, despite the suspension, he continues to testify extensively as an expert witness in medical malpractice cases. True, his income from testifying has fallen to 35 percent of what it was before the suspension, when it was more than $220,000 a year. Austin's brief describes

this drop in income as "disastrous" and "catastrophic," but that is a hyperbolic characterization. Thirty-five percent of $220,000 is a healthy $77,000--and this is merely as it were Dr. Austin's moonlighting income, income from a sideline to his primary profession, which is that of a neurosurgeon, not an expert witness (he does not claim the dubious title of "professional expert witness"). That is not the kind of professional body blow that the cases have in mind when they speak of an "important economic interest" jeopardized by the action of a voluntary association. Compare Van Daele v. Vinci, supra, 282 N.E.2d at 731-32, where expulsion from an association of independent retail grocers placed the plaintiff grocer at a potentially catastrophic competitive disadvantage by denying him access to the volume discounts that the association obtained from its suppliers. At the very least, the association's action must jeopardize the principal source of the professional's livelihood, and not a mere sideline. Compare Falcone v. Middlesex County Medical Society, supra, 170 A.2d at 794, where the refusal of a local medical society to admit a duly licensed physician to membership prevented him as a practical matter from practicing as a surgeon and obstetrician by denying him access to local hospitals. Where membership is optional, expulsion (or suspension, or denial of admission) is not deemed the invasion of an important economic interest. Treister v. American Academy of Orthopaedic Surgeons, 396 N.E.2d 1225, 1231-32 (Ill. App. 1979); Finn v. Beverly Country Club, 683 N.E.2d 1191, 1193 (Ill. App. 1997); Lee v. Snyder, 673 N.E.2d 1136, 1139 (Ill. App. 1996).

But there is much more that is wrong with this suit. There is no basis for Austin's claim that the Association entertains only complaints against members who testify on behalf of malpractice plaintiffs. What is true is that to date all complaints (but there have been very few) have been against such members; but the reason is at once obvious and innocent. If a member of the Association is sued for malpractice and another member gives testimony for the plaintiff that the defendant believes is irresponsible, it is natural for the defendant to complain to the Association;

a fellow member has irresponsibly labeled him negligent. If a member of the Association who testifies for a plaintiff happens to believe that the defendant's expert witness was irresponsible, he is much less likely to complain, because that expert (and fellow member of the Association) has not accused him of negligence or harmed him in his practice or forced him to stand trial or gotten him into trouble with his liability insurer. The asymmetry that Austin points to as evidence of bad faith is thus no evidence of bad faith at all; and he has no other evidence of bad faith.

In support of his further claim that it is against public policy for a professional association to sanction one of its members for irresponsible (as distinct from knowingly false) testimony, Austin argues that the threat of such sanctions is a deterrent to the giving of expert evidence and so a disservice to, indeed an interference with, the cause of civil justice. We disagree and think the courts of Illinois would likewise; this kind of professional self-regulation rather furthers than impedes the cause of justice. By becoming a member of the prestigious American Association of Neurological Surgeons, a fact he did not neglect to mention in his testimony in the malpractice suit against Ditmore, Austin boosted his credibility as an expert witness. The Association had an interest--the community at large had an interest--in Austin's not being able to use his membership to dazzle judges and juries and deflect the close and skeptical scrutiny that shoddy testimony deserves. It is no answer that judges can be trusted to keep out such testimony. Judges are not experts in any field except law. Much escapes us, especially in a highly technical field, such as neurosurgery. When a member of a prestigious professional association makes representations not on their face absurd, such as that a majority of neurosurgeons believe that a particular type of mishap is invariably the result of surgical negligence, the judge may have no basis for questioning the belief, even if the defendant's expert testifies to the contrary.

The Daubert rule, it is true, requires judges to screen proposed expert witnesses carefully to make sure that

their testimony will be responsible, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318-19 (7th Cir. 1996); Wilson v. City of Chicago, 6 F.3d 1233, 1238-39 (7th Cir. 1993), but only federal courts are bound by the rule (though this is not a limitation particularly relevant here, since the malpractice suit that Austin testified in was tried in a federal district court); and it is not airtight. (See Ambrosini v. Labarraque, 101 F.3d 129, 133-34 (D.C. Cir. 1996), discussing the limited nature of the judge's gatekeeping role under Daubert.) Judges need the help of professional associations in screening experts. The American Association of Neurological Surgeons knows a great deal more about anterior cervical fusion than any judge, and if the Association finds in a proceeding that comports with the basic requirements of due process of law that a member of the Association gave irresponsible expert testimony, that is a datum that judges, jurors, and lawyers are entitled to weigh heavily. One has only to read the transcript of the disciplinary hearing, and particularly the questions that the members of the hearing panel, all neurosurgeons of course, directed to Dr. Austin, to realize how far the ordinary voir dire of an expert can fall short. The market response to Austin's suspension has not been irrational.

We doubt that he would embrace the converse of the rule for which he contends, and concede that if a judge rules that a proposed expert's testimony is inadmissible because irresponsible, that ruling is a proper predicate for professional discipline. Fair enough; a judge is not a surgical expert and his ruling on the admissibility of an expert's witness may be in error. But by the same token the judge's ruling that expert testimony is admissible should not be taken as conclusive evidence that it is responsible testimony.

There is a great deal of skepticism about expert evidence. It is well known that expert witnesses are often paid very handsome fees, and common sense suggests that a financial stake can influence an expert's testimony, especially when it is technical and esoteric and hence difficult to refute in terms intelligible

to judges and jurors. More policing of expert witnessing is required, not less. Not that professional self-regulation is wholly trustworthy. Professional associations have their own axes to grind. No doubt most members of the AANS are hostile to malpractice litigation, and this may impart a subtle bias to its evaluation of members' complaints, though there is nothing in the transcript of the hearing before the Association's hearing panel to justify such an inference. But even in cases such as this, where the absence of an "important economic interest" deprives the disciplined member of the special protections of Illinois voluntary-association law, he has recourse to defamation law should the discipline falsely impugn his professional competence, see, e.g., Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d Cir. 1994); Fitzgerald v. Minnesota Chiropractic Ass'n, Inc., 294 N.W.2d 269 (Minn. 1980), including his competence to testify responsibly on issues within the scope of his professional expertise. If Austin was wronged by the Association, he had remedies, but not under the Illinois law of voluntary associations.

We note finally that there is a strong national interest, which we doubt not that Illinois would embrace, in identifying and sanctioning poor-quality physicians and thereby improving the quality of health care. Although Dr. Austin did not treat the malpractice plaintiff for whom he testified, his testimony at her trial was a type of medical service and if the quality of his testimony reflected the quality of his medical judgment, he is probably a poor physician. His discipline by the Association therefore served an important public policy exemplified by the federal Health Care Quality Improvement Act, 42 U.S.C. sec.sec. 11101 et seq., which encourages hospitals to conduct professional review of its staff members and report malpractice to a federal database. As an inducement to the vigorous performance of this reporting function, the Act immunizes hospitals from liability for disciplinary actions they take against staff physicians, provided only that the hospital is acting in good faith. See 42 U.S.C. sec.sec. 11101, 11111, 11112; Brader v. Allegheny General Hospital, 167 F.3d 832, 839-41

(3d Cir. 1999); Wayne v. Genesis Medical Center, 140 F.3d 1145, 1148 (8th Cir. 1998) (per curiam); Imperial v. Suburban Hospital Ass'n, Inc., 37 F.3d 1026, 1028 (4th Cir. 1994).

   As a final detail, irrelevant on the view we take of this case but possibly relevant to future cases, we note themerited difficulty of proof of damages in a case such as this. Austin cannot obtain damages for any injury to his professional reputation and resulting fee-earning opportunities as a result of the accurate revelation of his having given irresponsible testimony under oath in a suit for medical malpractice. That injury is the direct consequence of socially valuable information; that it might have been precipitated by an unlawful act (though we think not) would not make the act a "cause" of the injury in a sense that the law recognizes. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977), establishes the principle in the antitrust context, but it is equally apropos the common law tort context. A competitor of a merged firm claimed to be injured because the merger, though unlawful, had intensified lawful competition with it. The Court held that the injury this firm had sustained was not the kind of injury that antitrust law tries to prevent--on the contrary, lawful competition is an "injury" (to competitors hurt by competition) that the antitrust laws seek to promote. To put this differently, the merger had both good and bad effects, and the good effects should not be punished by an award of damages. It is the same here. Tort law does not seek to prevent injuries arising from the dissemination of truthful information that rationally induces withdrawal of patronage from the person whom the information concerns. So Austin, had he proved a wrong, would have had to partition the injury resulting from it between the part due to the revelation of truthful information and the part due to the disciplinary suspension itself. Compare the many cases which hold that the victim of defamation can obtain damages only for any incremental harm done to his reputation by the defamation--if his reputation has already been destroyed by truthful information, he has no remedy. E.g., McIlvain v. Jacobs, 794 S.W.2d 14, 15-16 (Tex. 1990); Desnick v. American

Broadcasting Cos., 44 F.3d 1345, 1350 (7th Cir. 1995); Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1228 (7th Cir. 1993); Re v. Gannett Co., 480 A.2d 662, 669 (Del. Super. 1984), affirmed, 496 A.2d 553 (Del. 1985).

Affirmed.


   Williams, Circuit Judge, concurring in part and in the judgment.  I join the majority opinion only insofar as it holds that Dr. Austin has not demonstrated an "important economic interest" in membership in the American Association of Neurological Surgeons. Without an important economic interest, Dr. Austin may not challenge in the courts the Association's private, internal procedure under Illinois law. Van Daele v. Vinci, 282 N.E.2d 728, 731 (Ill. 1972). As that holding is dispositive of this case, in my view we need not proceed to predict whether Illinois would find the Association's procedure a violation of public policy. Cf. Disher v. Info. Res., Inc., 873 F.2d 136, 141 (7th Cir. 1989) ("We are reluctant to opine unnecessarily on questions of state law."); Graphic Sales, Inc. v. Sperry Univac Div., Sperry Corp., 824 F.2d 576, 581 (7th Cir. 1987) ("As a federal court whose jurisdiction is based on diversity of citizenship, we are particularly hesitant to decide unsettled questions of state law unnecessarily.").