In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3426

PATRICK J. BRANDNER,

*Plaintiff-Appellant,*

*v.*

AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS and AMERICAN ASSOCIATION OF ORTHOPAEDIC SURGEONS,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 8161 — **Ronald A. Guzmán**, *Judge.*

ARGUED APRIL 10, 2014 — DECIDED JULY 24, 2014

Before CUDAHY and EASTERBROOK, *Circuit Judges*, and LAWRENCE, *District Judge.**

EASTERBROOK, *Circuit Judge*. Patrick Brandner, an orthopedic surgeon, belongs to many professional groups, among them the American Academy of Orthopaedic Surgeons and

---

* Of the Southern District of Indiana, sitting by designation.

the American Association of Orthopaedic Surgeons (collectively "the Academy"). He is no longer able to perform surgery, so he specializes in consultations and other medical endeavors that do not require fine motor control. He devotes most of his time to providing expert advice and testimony in litigation.

The Academy has ethical standards to which its members must adhere when providing expert testimony. It concluded that Brandner violated these standards by professing greater confidence in one case than the evidence warranted. (We omit details, which do not affect the appeal's disposition.) The Academy decided to suspend him for one year. Before that suspension could take effect he filed this suit under the diversity jurisdiction, contending that the Academy violated Illinois law and its own governing documents. The Academy has deferred the start of the suspension until final resolution of the litigation.

The Academy is a private group, and Illinois (whose law the parties agree controls) does not allow judicial review of a private group's membership decisions unless membership is an "economic necessity" or affects "important economic interests." See *Van Daele v. Vinci*, 51 Ill. 2d 389 (1972); *Treister v. American Academy of Orthopaedic Surgeons*, 78 Ill. App. 3d 746, 755–56 (1979); *Austin v. American Association of Neurological Surgeons*, 253 F.3d 967 (7th Cir. 2001) (Illinois law). (Judges sometimes use these phrases as equivalent, though they have different meanings.) The district court concluded that a one-year suspension would devastate Brandner's income and thus asked whether the Academy had followed its own rules. After answering in the affirmative, the court granted summary judgment for the Academy. 2012 U.S. Dist. LEXIS

138833 (N.D. Ill. Sept. 27, 2012). The first and last question we address is whether Brandner has established that the suspension would affect his important economic interests.

Brandner does not contend that membership in the Academy is necessary to any of his activities; the suspension does not affect his license to practice medicine, and no one needs a license or membership of any kind to furnish litigation-support services (or testify as an expert). Instead he argues that suspension will be financially costly. The district court found that between 2008 and 2010 approximately 73% of Brandner's net income came from his litigation-support services (both his testimony and his assistance to lawyers or testimonial experts). The judge thought that this income would vanish if the Academy were to suspend Brandner for a single year. The judge recognized that Brandner's income from non-litigation work exceeds $200,000 a year but thought it likely that this would dwindle as well. The judge understood that *Austin* had held that a 65% decline in litigation-related income, from $220,000 to $77,000 a year, did not demonstrate the economic necessity of membership or injure important economic interests. 253 F.3d at 971–72. But the judge concluded that Brandner had surmounted that threshold by alleging that the suspension would drive his litigation-related income to zero and "end his medical career."

The nub of Brandner's position is his assertion that, once suspended, he would be damaged goods whom no litigant would want to hire, even for advice. That he retains his right to practice medicine, his active membership in other organizations, and his good standing in the Academy itself (after a year) would be irrelevant if one black mark ends a physician's career as both a witness and a consultant, taking a big

bite out of other income as well. A career-killing effect would show that continuous membership is an economic necessity.

But talk is cheap. *Has* suspension by the Academy ended the career of other members found to have performed unethically in a single case? The names of suspended members are public knowledge. (That's essential if suspension is to blot a member's reputation.) What has happened to the income of other members who have been suspended? Is that effect (whatever it is) life-long, or does it diminish as the years pass? Does the effect vary with the length of the suspension? Many lawyers suspended from the bar for a year—and who therefore cannot practice *at all*—return to practice after the suspension ends; some of them earn substantial incomes. Reputation is important to a lawyer in attracting clients, just as it is important to a physician. If lawyers can survive a suspension from practice, can't physicians survive suspension from a single voluntary organization?

These are empirical questions, on which the record shows—nothing. Nor has Brandner pointed us in the direction of any published study of this subject (for the Academy or any other professional organization). That leaves no basis for a conclusion that Brandner's income from expert services (testimony and consulting) would fall to zero for life. His own say-so is no substitute for evidence. The district court decided this case on motions for summary judgment, and a motion for summary judgment requires the litigant who opposed it to provide evidence, not just assertions or argument. To get anywhere, a litigant must back up allegations with evidence that create a material dispute requiring trial; for Brandner, all we have are allegations.

Brandner says that he is different from many other members of the Academy because he does not perform surgery. We appreciate that this makes litigation assistance a larger portion of his income than it is for most of the Academy's members. But the question on which the record is empty—what happens to a suspended member's income from litigation-related services?—is no less pertinent for Brandner than for others. If a one-year suspension reduces other members' litigation-linked income by, say, 50%, that would be the expected outcome for Brandner too. We know from *Austin* that even a 65% fall in litigation-related income would not allow judicial review of the Academy's decision, if it left Brandner with a healthy remainder. (If his litigation-related income fell by the same proportion as Austin's did, he would earn about $194,000 a year from that specialty and another $200,000 or so from orthopedic services; the total is nothing to sneeze at.)

Aggregate data are not the only way to show that suspension would impair a member's important economic interests. The plaintiff could show what happened to him, just as Austin did. Perhaps Brandner was hit worse than Austin; he may be uniquely vulnerable, a financial form of an eggshell skull. Austin provided numbers about his own situation; Brandner did not. Yet numbers should be readily available and could verify or refute Brandner's contentions.

Brandner testified by deposition in August 2005 and at trial in April 2008. A member of the Academy complained in October 2008 that Brandner's testimony had violated the Academy's code. The Academy's Committee on Professionalism concluded in May 2009 that the complaint established a prima facie case of unprofessional conduct. The Academy

held a formal hearing late that year and sustained the charge; Brandner took an internal appeal, which led to more hearings and a decision in April 2010 that Brandner had violated the Academy's rules. He asked for that decision to be reviewed by the Academy's Board of Directors. It did so and in December 2010 made the final decision, once again concluding that Brandner's testimony violated the Academy's requirements. The Academy did not make an immediate public announcement—but Brandner himself, by filing suit earlier in 2010, ensured that the details became public knowledge. The Academy's extended process involved many physicians; some leakage was inevitable.

So what happened between the charge (October 2008) and the district court's decision (September 2012)? If Brandner is right that a single blot on his record would make him a pariah, the decline of his litigation-related income should have begun no later than the month he filed suit: once the Academy's decision came to the public's attention potential clients would flee, because even if they still valued his advice and testimony they would fear that the issue would be the subject of cross-examination and turn juries against Brandner and anyone he supported. Yet the record is as silent about what happened to Brandner's income as it is about what happened to the income of other physicians the Academy suspended.

Austin offered evidence. We thought it inadequate, but it shows that a decline in litigation-related income can be documented. Brandner has offered only hot air. In other words, he has expressed his opinion with greater confidence than the evidence warrants. He has not established that a one-year suspension from the Academy would end his profes-

sional career. We therefore affirm the district court's judgment without reaching any of the parties' arguments about the procedure the Academy used.

AFFIRMED