NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0589n.06

No. 14-2515

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Aug 18, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ARTHUR S. LIEBERMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| AMERICAN OSTEOPATHIC ASSOCIATION, et | ) | COURT FOR THE EASTERN |
| al., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: BOGGS and DONALD, Circuit Judges; QUIST, District Judge.[*]

BOGGS, Circuit Judge. Defendant-Appellee American Osteopathic Board of Family Physicians (AOBFP) certifies osteopathic physicians, providing qualifying physicians with "board certification." Certain insurance companies will not reimburse patients for treatment by osteopathic physicians whom the AOBFP has not certified. One osteopathic physician, first certified in 2002, is Plaintiff-Appellant Arthur S. Lieberman. Although osteopathic physicians certified in 1997 or earlier were grandfathered into lifetime certification, certification first awarded after 1997—such as Lieberman's—lasts for eight years only; after eight years, the AOBFP certification expires, requiring osteopathic physicians who want certification to seek re-certification.

In 2010, Lieberman twice failed the examination that the AOBFP requires candidates to pass for certification. After the Board declined to certify Lieberman, he sued the AOBFP and

---

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

Defendant-Appellee American Osteopathic Association (AOA) in Michigan state court on two legal theories—violation of common-law due process and tortious interference with a contract—and also sought injunctive relief. AOA and AOBFP (together, defendants) removed to federal court and moved to dismiss. The district court granted their motion. Lieberman timely appealed. We affirm the judgment of the district court for the reasons that follow.

As a preliminary matter, although the defendants offer as an alternative ground for affirmance that Lieberman signed a binding release of his rights to file the present suit, the district court considered the merits of Lieberman's claim, and we affirm the judgment of the district court on the same grounds.

I

The parties agree that we must apply the law of Illinois, where the defendants are located. "Ordinarily a dispute between a voluntary association and one of its members is governed by the law of contracts . . . ." *Austin v. Am. Ass'n of Neurological Surgeons*, 253 F.3d 967, 968 (7th Cir. 2001). But not in certain circumstances under Illinois law. Because "membership in good standing in a professional association may be essential to a professional's livelihood, Illinois . . . has conferred additional legal rights on members," like Lieberman, "of voluntary associations," like the defendants. *Id.* at 969. A plaintiff may seek judicial relief not only for actions under contract but also, if he "can show that the association's action of which he complains substantially impaired an 'important economic interest' of his," for violations of common-law due process or for bad faith, although "[w]hat 'bad faith' adds . . . is obscure." *Ibid.* (suggesting that courts may regard bad faith "either as a component of the due process analysis, analogous to the requirement of an impartial tribunal . . . or as an implied term in the contract between the association and its members").

The district court here held that Lieberman pled sufficient facts regarding economic harm. The defendants dispute that holding, and we have jurisdiction here to affirm the district court on any ground in the record. But we think the district court's grounds were the clearest, and so we assume, without deciding, that Lieberman sufficiently pled economic harm. Therefore, we first consider whether the defendants violated the process due to Lieberman at common law. Under Illinois law, proceedings violate due process only if they are "arbitrary and unreasonable," lack substantial evidence, or (perhaps) are taken in bad faith. *See, e.g.*, *Butler v. USA Volleyball*, 673 N.E.2d 1063, 1067 (Ill. App. Ct. 1996).

Lieberman suggests that two aspects of the defendants' certification procedures violated his common-law due-process rights. First, Lieberman contends that it was arbitrary and capricious to require him to pass a test on material that he alleges is not related to his actual practice. Even assuming without deciding that the material at issue is immaterial to *his* practice, we reject this contention. The equal imposition of a testing requirement, no matter how disagreeable to Lieberman, is not "arbitrary and capricious" and certainly does not violate the process due to osteopaths who, like Lieberman, wish to be board-certified.

Two cases from the Illinois state courts guide us on this issue. The plaintiff in *Taylor v. Hayes* was a psychologist who began his practice prior to state regulation of psychology. 264 N.E.2d 814 (Ill. App. Ct. 1970). The state's initial regulations required psychologists to possess a degree he did not have, and so forbade him from practice. He sued under the Illinois and U.S. Constitutions. The court held that while the constitutions did not entitle him to be grandfathered into practice without licensure, due process did require that the state provide an alternate medium, such as an examination, through which to demonstrate his qualifications. The court ordered the state to conduct such an examination. Following *Taylor*, the plaintiff in *Miller v.*

3

*Department of Professional Regulation*, 658 N.E.2d 523 (Ill. App. Ct. 1995), practiced engineering prior to state regulation of engineering. When the state first promulgated regulations to prevent the unlicensed practice of engineering, he sued under the Illinois and U.S. Constitutions, claiming a right to be "grandfathered" into a license without passing the two eight-hour examinations that the regulations required. Understanding *Taylor*'s holding to be "that due process requires the State to give individuals . . . a fair opportunity to comply with the newly imposed regulations," *Id.* at 530, the court concluded that the state's required tests constituted "exactly the type of professional competency examination endorsed by *Taylor* and its progeny." *Id.* at 531.

The parties dispute the application here of *Miller*. Lieberman suggests that *Miller* applies only to licensure; once a professional is licensed, he reasons, professional organizations ought not to exclude him. Defendants suggest instead that *Taylor* and *Miller* would allow their examination requirement here, even applying *constitutional* protections to *state* behavior (licensure), so *a fortiori* allow *private* behavior (certification) under *common-law* protections.

Defendants—whose business model depends on certifying some, but not all, licensed professionals in their field—have the better argument here. Plaintiffs cite no law to support the theory that, while states may impose standards for entry into a profession and evaluate candidates accordingly, it would be unconstitutional for private organizations of professionals to impose similar standards and evaluation schemes. Nor can we think of a reason, especially because, as a general matter, the law allows private organizations to differentiate people along more lines than it allows the state to. A professional organization that "does not wield any state power . . . need not use the procedures the due process clause requires of the government." *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994), *as*

4

*amended on denial of reh'g* (Jan. 11, 1995). It was not a violation of due process to condition Lieberman's re-certification on an examination.

Second, and more compellingly, Lieberman argues that, because the AOBFP grandfathered physicians who obtained certification prior to 1997, it was arbitrary not to grandfather *him*, whom the AOBFP first certified in 2002, into lifetime certification. On appeal, the defendants offer no reason for choosing 1997, but Lieberman alleges one: to inflate membership numbers in order to ensure a monopoly on the certification of osteopaths.[1]

But a grandfather clause does not violate the constitutional right of due process if applied by the *government*. *Cf. Watson v. Maryland*, 218 U.S. 173 (1910); *Dent v. W. Virginia*, 129 U.S. 114 (1889). And "[i]f a governmental unit may use a grandfather clause, there appears no reason why a private association may not." *Dietz v. Am. Dental Ass'n*, 479 F. Supp. 554, 561 (E.D. Mich. 1979) (Kennedy, C.J.); *cf. Sanjuan*, 40 F.3d at 250. We AFFIRM the district court's dismissal of Lieberman's due-process claims.

II

Lieberman also complains that the defendants tortiously interfered with his contracts by informing insurance companies that he had lost his certification. Under Illinois law, "the elements of the tort of intentional interference with existing contract rights" includes the "defendant's intentional and *unjustified* inducement of a breach of [a] contract" between the plaintiff and another. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989) (emphasis added). Here, even if, as Lieberman claims, AOBFP's failure to recertify him resulted in insurance companies and clients terminating their relationships with

---

[1] Although Lieberman alleges, for the purpose of demonstrating economic harm under Illinois common-law due process, that defendants have a "monopoly over the osteopathic medical field," see Appellant Br. 1, 18, 19, 21, we do not understand him to allege that, and we do not consider whether, defendants have violated antitrust laws. *See, e.g.*, *Sanjuan*, 40 F.3d at 250 (distinguishing the parties liable under constitutional due-process doctrine from those under antitrust law).

him, and even if that (subsequent) termination constituted actionable breach of contract by insurance companies, Lieberman's failure of the examination justified the defendants' actions, whatever the legality of the subsequent insurance-company actions.

Clients and insurance companies indeed may *rely* on AOBFP to decline to recertify osteopaths who failed to pass AOBFP's Board Certification process. As the Supreme Court has observed, "the strength of a certification is measured by the quality of the organization for which it stands." *Peel v. Attorney Registration & Disciplinary Comm'n of Illinois*, 496 U.S. 91, 102 (1990) (plurality opinion); *cf. Austin*, 253 F.3d at 974 (observing that "[t]ort law does not seek to prevent injuries arising from the dissemination of truthful information that rationally induces withdrawal of patronage from the person whom the information concerns").

The kind of certification in which defendants engage and of which Lieberman complains enjoys congressional encouragement in the Lanham Act's provision for certification marks. 15 U.S.C. § 1054.[2] The AOBFP maintains a certification mark of its name, Registration No. 4,052,701. Its statement provides that:

> The certification mark, as used by persons authorized by the certifier, certifies that the service provider has met certain minimum formal education standards, maintains current certification or licensure in their healthcare field, and has met experience standards in the field of family physicians, and that the work in rendering the services was performed by persons who have met the standards and criteria established by the certifier.

*Id.*, available at U.S. Patent and Trade Mark Office, Trade Mark Elec. Search Sys., http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:q9rj1v.2.1 (accessed Aug. 7, 2015).

---

[2] As one scholar has explained, "[a] certification mark is a special creature created for a purpose very different from that of an ordinary trademark or service mark. It is a mark owned by one person and used by others in connection with their . . . services to certify quality . . . ." 3 McCarthy on Trademarks and Unfair Competition § 19.91 (4th ed.); *see also* 15 U.S.C. § 1127 (defining "certification mark"). "One who sees such a certification mark" may assume that the service to which the mark is connected "in fact meets whatever standards . . . have been set up . . . by the certifier. . . . *There is no government control over what are the standards that the certifier uses*." 3 McCarthy on Trademarks and Unfair Competition § 19:91 (4th ed.) (emphasis added).

If the defendants are liable for every insurance company's decision not to reimburse treatment by Lieberman, then the owners of the Better Business Bureau mark could be liable for every client's decision to solicit a certified "better" business instead of a non-certified one, the owners of the Good Housekeeping Seal of Approval are liable for every person who purchases "approved" products at the expense of others, and the Orthodox Union is liable for every kosher-keeping consumer's decision not to purchase otherwise-appetizing foodstuffs lacking the symbol indicating adherence to certain aspects of Jewish law. Far from encouraging tortious interference with contracts, certification marks—and the certification processes established to make them function—stimulate the use of markets to further goals that the government may not advance directly. *Cf.* Ian Ayres & Jennifer Gerarda Brown, *Mark(et)ing Nondiscrimination: Privatizing ENDA with a Certification Mark*, 104 Mich. L. Rev. 1639, 1642 (2006) (suggesting that companies could apply for a mark that certifies voluntary compliance with a proposed Employment Non-Discrimination Act because, in part "consumers . . . can reward companies that treat gay employees" according to the terms of the proposed act "by purchasing their products and services").

We AFFIRM the district court's dismissal of Lieberman's tortious interference claims.