Joseph B. CURD, Jr., Appellant

v.

KENTUCKY STATE BOARD OF LI-
CENSURE FOR PROFESSIONAL
ENGINEERS AND LAND SURVEY-
ORS, Appellee

and

Kentucky State Board of Licensure
for Professional Engineers and
Land Surveyors, Appellant

v.

Joseph B. Curd, Jr., Appellee.

Nos. 2012–SC–000165–DG,
2012–SC–000169–DG.

Supreme Court of Kentucky.

June 19, 2014.

Robert V. Bullock, Bullock & Coffman, LLP, for Appellant/Appellee Joseph B. Curd, Jr.

Jonathan Buckley, Kentucky State Board of Licensure for Professional Engineers and Land Surveyors, for Appellee/Appellant Kentucky State Board of Licensure for Professional Engineers and Land Surveyors.

Opinion of the Court by Chief Justice MINTON.

Joseph B. Curd, Jr., a Kentucky-licensed land surveyor, testified as a trial expert on behalf of the defendants in a quiet-title action in the Wayne Circuit Court. In the course of his testimony, Curd—operating solely off of an historic deed's calls and distances—opined in support of the defense theory that the disputed boundary extended across a highway traversing the disputed area. Unconvinced by Curd's testimony, the trial court—sitting without a jury—ultimately ruled in favor of the plaintiffs. After the case was over, the Kentucky State Board of Licensure for Professional Engineers and Land Surveyors conducted disciplin-

ary proceedings against Curd for his allegedly misleading and inaccurate trial testimony. The Board found Curd's performance as an expert witness violated professional standards and suspended Curd's surveyor's license for six months.

Curd appealed the Board's decision to the Franklin Circuit Court; and the Board, following an adverse decision by that court, appealed to the Court of Appeals. The decision of the Court of Appeals was not entirely favorable to either party, so both moved for discretionary review in this Court. We granted discretionary review to analyze whether the Board can properly police a licensee's expert testimony and whether the statutes and regulations used by the Board to sanction Curd were unconstitutionally vague as applied to him.

We affirm, in part, and reverse, in part, the opinion of the Court of Appeals. In so doing, we agree with the Court of Appeals that Curd is not immune from possible disciplinary action by the Board and that a number of the statutes and regulations enforced by the Board against Curd are impermissibly vague as applied to him. We further agree with the opinion of the Court of Appeals that the issue of substantial evidence before the Board—paramount in any review of agency action—was not addressed by the circuit court. But we disagree with the Court of Appeals that remanding this appeal to the circuit court for substantial-evidence review is warranted. The parties have presented the substantial-evidence issue at every appellate level. And we see no reason to remand for substantial-evidence review. Upon a complete review of the record, we hold today that the Board's decision to discipline Curd is supported by substantial evidence. In light of a number of the statutes and regulations relied on by the Board in its initial decision ruled unconstitutional as applied to Curd, we remand the case to the Board for reconsideration of Curd's sanction.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

The Denneys and the Southwoods owned adjacent property along the Eadsville Highway in Wayne County, Kentucky. The Southwoods held a deed to a 110–acre tract contiguous to two tracts owned by the Denneys. The Southwoods maintained that their 110–acre tract encompassed the Matthews tract,[1] which the Denneys claimed belonged to them, and extended south across the Highway to include about 12 acres of the Denneys' property. The Denneys brought an action in circuit court to establish boundary lines and quiet title against the Southwoods.[2]

After meeting with other land surveyors, the Southwoods eventually hired Curd as their expert for the case; and he testified for them in a discovery deposition and at trial. Throughout his testimony, Curd maintained that the calls and descriptions appearing in the Southwoods' deed included the Matthews tract and extended their property line across the highway. Curd created a deed plot[3] as a visual aid to

---

1. This 9.5–acre tract has been referred to as the "Matthews tract" throughout the litigation because it was labeled as such on a 1944 plat (Ramsey plat).

2. Wayne Circuit Court, Civil Action No. 01–CI–00201.

3. A deed plot is a preliminary document created by land surveyors during their title research before actually performing a field survey, placing boundary lines, and setting property corners. The calls and distances mentioned in the relevant deeds—of both the particular tract in question and those surrounding—are used to orient the land surveyor and provide a general picture of how the tracts lie. As was Curd's choice, often land surveyors overlay the deeds on a topographic

illustrate further how the Southwoods' tract extended over the highway and encompassed the adjoining Matthews tract. During his testimony, Curd acknowledged the surveying principle that, generally speaking, a deed's monumentation controls over its calls and distances. But, while admitting the Southwoods' deed actually called for the Matthews tract's boundary line and the highway as boundary monuments, Curd emphasized the work he performed on the Southwoods' behalf was only preliminary and did not involve identifying the monumentation that an actual field survey would require. The Board acknowledges the Southwoods' deed can be interpreted to cross the highway but *only* if monumentation is ignored.

The Denneys' trial expert was James West, also a Kentucky-licensed land surveyor. At trial, Curd challenged the adequacy of West's deed research. Regarding his own research, West stated the following during his deposition:

Q. What work did you do in the deed room prior to surveying this property?

A. I didn't do any. [The Denneys' attorney] furnished me with the research on it. I did look up adjoining deeds and so forth, but I didn't do any title work on this deed. Curd thus criticized West at trial, pointing to his failure to perform deed research as a practice that fell below the surveying profession's minimum requirements.

Curd testified at trial that he was an investigator employed by the Board. This assertion was inaccurate. Curd had been an investigator for the Board, but the Board failed to renew Curd's employment contract three months before he testified at trial. Curd asserts that the Board had failed to renew his contract in a timely manner on earlier occasions and he had no indication this particular delay was any different. The Board admits that it had been late in renewing Curd's contract in the past and that it had not asked Curd to return his credentials.

After the trial, the Southwoods initiated disciplinary action against West before the Board. The Board investigated West's conduct and found only minor violations not worthy of substantial discipline. While investigating West's conduct, the Board also reviewed Curd's conduct and found sufficient issues to bring, on its own motion, a disciplinary action against Curd.

As provided by its disciplinary process, the Board held a three-day adversarial hearing in which both the Board and Curd called witnesses. The Hearing Officer, issuing sixty-four findings of fact and fifty-seven conclusions of law, concluded that Curd's testimony in the circuit court case was dishonest and misleading and that Curd ignored or suppressed material facts. Accordingly, the Hearing Officer found Curd violated Kentucky Revised Statutes (KRS) 322.180(2) and (12), as well as 201 Kentucky Administrative Regulations (KAR) 18:142(2), (3), and (9). The Board accepted the Hearing Officer's finding and suspended Curd's license for six months.

Curd appealed the Board's decision to the Franklin Circuit Court, which rejected his argument that the Board was without jurisdiction to discipline him for his expert testimony but found the statutes supporting the Board's sanctioning of Curd to be unconstitutionally vague as applied to him. Specifically, the circuit court noted the Board should not engage in policing expert testimony presented in judicial proceedings absent extraordinary circumstances. In light of its constitutional ruling, however, the circuit court considered moot all other issues Curd presented on appeal.

map to understand better their location rela- tive to the terrain.

Both the Board and Curd appealed the Franklin Circuit Court judgment to the Court of Appeals.

Before the Court of Appeals, the Board took issue with the circuit court's determination of unconstitutionality. Curd, on the other hand, disputed the circuit court's determination that the Board had the authority to police expert testimony and disagreed with the circuit court's refusal to review any other issues following its ruling on constitutionality.

The Court of Appeals held that Curd is not entitled to absolute immunity when testifying in a judicial proceeding and that the Board has jurisdiction to monitor expert testimony in judicial proceedings. Reversing the circuit court, in part, the Court of Appeals viewed as constitutional 201 KAR 18:142(3). In light of this determination, the Court of Appeals found it necessary to remand the case to the circuit court to resolve the yet unresolved issue of whether the Board's action was based on substantial evidence.

## II. ANALYSIS.

Before this Court, Curd essentially presents two main issues distinct from those presented by the Board: (1) Kentucky law should afford absolute immunity to experts who testify in judicial proceedings, and (2) the Board's action violates the separation of powers mandated by the Kentucky Constitution.

The Board primarily advances the argument that the statutes and regulations under which Curd was sanctioned are in no way vague, let alone to a constitutionally infirm degree. The Board also argues the constitutional question is essentially a distraction because its decision to sanction Curd was supported by substantial evidence and judicial review ceases at that point. Curd, of course, disagrees with this substantial-evidence argument, countering that the Board's decision was arbitrary and unsupported by substantial evidence.

We address each argument in turn, but the interconnectedness of substantial-evidence review and the lurking constitutional issues mandates we deal simultaneously with those particular issues.

### A. Curd is not Entitled to Absolute Immunity as an Expert Witness.

According to Curd, the issue whether an expert witness in a judicial proceeding is immune absolutely from administrative discipline as a result of testimony is one of first impression in Kentucky. Admittedly, we have not had a chance to review exactly the circumstances Curd presents today. But we have resolved analogous circumstances, and only a slight distinction exists between those circumstances and those presented by Curd. Accordingly, we reject Curd's argument as inconsistent with our jurisprudence.

The leading case on this topic, *Maggard v. Commonwealth, Bd. of Examiners of Psychology*,[4] is of recent vintage; and we find very few cases from other jurisdictions addressing the issue. An attorney approached Maggard, a licensed psychologist for over twenty years at the time of the action, to request a psychological evaluation of a three-year-old girl allegedly traumatized by a dentist. The attorney was weighing whether to bring a suit against the dentist. Without interviewing the young girl, Maggard prepared a written report of a clinical assessment in which he found the girl suffered "permanent psychological injury as a result of the treatment by the dentist."[5] Not surprisingly,

---

4. 282 S.W.3d 301 (Ky.2008).

5. *Id.* at 302.

the dentist took offense at Maggard's report and filed an administrative complaint against Maggard with the applicable professional-licensure board, the Kentucky Board of Examiners of Psychology. After an investigation and a hearing, the Board found Maggard's report, issued without having interviewed the child, misleading and negligent. Accordingly, the Board suspended Maggard's license for one year.

Maggard challenged the Board's action and argued, among other things, that he should be entitled to absolute immunity "because he was participating in a civil judicial proceeding." [6] But this Court rejected Maggard's argument, noting that he was "neither court-appointed nor an integral part of the judicial process in the case. Moreover, the immunity granted to a witness in a judicial proceeding is immunity from liability for civil damages." [7] Maggard, like Curd here, was seeking immunity not from civil liability, but from administrative discipline. Our denial of immunity in *Maggard* could not be more clear.

Attempting to distinguish the instant circumstances from *Maggard*, Curd seizes on the following language: "*Maggard* was neither court-appointed nor an integral part of the judicial process in the case." [8] As an expert witness testifying at trial, Curd argues he falls outside the rule articulated in *Maggard* because he *was* "an integral part of the judicial process." The difference between Maggard's preparation of a report for civil litigation and Curd's expert testimony is slight but a difference nonetheless. Both an expert witness who testifies and an expert who prepares a report for litigation are called upon to render professional opinions and assist the understanding of subject matter typically beyond the ken of those untrained in the field. As a witness, however, Curd is subject to cross-examination and further judicial scrutiny, which is more stringent—at least in theory—than the review afforded an expert like Maggard simply submitting a report for use at trial.

But in highlighting this modest distinction, we must not lose sight of the underlying purpose of absolute immunity for witnesses. As recognized by the Washington Supreme Court in *Deatherage v. State, Examining Bd. of Psychology*,[9] absolute immunity is "a judicially created privilege founded upon the belief that the administration of justice requires witnesses in a legal proceeding be able to discuss their views without fear of a defamation lawsuit." [10]

The protection of expert witnesses' ability to testify freely in a judicial proceeding does not, however, merit placing them beyond the reach of *any* punishment for their improper testimony. The "scope of absolute [immunity] has been limited to situations where some power to discipline remains available[.]" [11] And subjecting expert witnesses who testify at trial to potential administrative discipline promotes not only the policies of the judicial system but those of the professional licensing agency as well. Professional discipline may very well "serve[ ] to advance the court's goal of accurate testimony from expert witnesses, [while furthering] the disciplinary board's goal of protecting the public." [12]

---

6. *Id.* at 303.

7. *Id.* (internal citations omitted).

8. *Id.*

9. 134 Wash.2d 131, 948 P.2d 828 (1997).

10. *Id.* at 830.

11. *Id.*

12. *Id.* at 832.

Extending absolute immunity to protect expert witnesses from the possibility of administrative discipline for their testimony stretches the concept beyond the point of recognition. As we explain below in relation to Curd's separation-of-powers argument, while a trial judge's authority to control the trial proceedings through evidentiary rulings is a lever to be used to encourage accurate expert testimony, that authority may be insufficient given the potential complexity of the technical, scientific, or otherwise specialized subject matter involved in the case. Perhaps when dealing with expert testimony, an administrative body well versed in the subject matter of the testimony may provide more effective accountability for professional candor. We reaffirm our holding in *Maggard* and decline to allow expert witnesses at trial to find refuge from professional discipline in the doctrine of absolute immunity.[13]

## B. The Actions of the Board do not Violate Separation of Powers.

■ As we have often observed throughout our jurisprudence, the Kentucky Constitution provides strong separation of powers among our three departments of state government: Executive, Legislative, and Judicial. Indeed, "[p]erhaps no state forming a part of the national government of the United States has a Constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does our Constitution[.]"[14] In arguing the Board's action violates the separation of powers principle,

Curd relies on Sections 27, 28, 109, and 116 of our Constitution. Sections 27 and 28 convey the separation of powers doctrine in the classic sense:

> **Section 27:** The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

> **Section 28:** No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

More specifically, Sections 109 and 116 outline the Judicial branch.

> **Section 109:** The judicial power of the Commonwealth shall be vested exclusively in one Court of Justice. . . .

> **Section 116:** The Supreme Court shall have the power to prescribe rules governing its appellate jurisdiction, rules for the appointment of commissioners and other court personnel, and rules of practice and procedure for the Court of Justice. The Supreme Court shall, by rule, govern admission to the bar and the discipline of members of the bar.

Curd relies on these sections to support his position that by policing his testimony, the Board usurped the authority of the circuit court. Essentially, Curd maintains his testimony was under the exclusive control of the judicial branch; and the execu-

---

**13.** Despite the paucity of cases dealing squarely with this issue, the position we express today is not novel. *See, e.g., Huhta v. State Bd. of Med.,* 706 A.2d 1275 (Pa. Commw.Ct.1998) (for further discussion, see Michael A. Trimmer, Huhta v. State Board of Medicine: *The Commonwealth Court of Penn-* *sylvania Holds that Judicial Immunity is not Applicable in Administrative Disciplinary Proceedings Before the State Board of Medicine,* 8 Widener J. Pub.L. 843 (1999)).

**14.** *Sibert v. Garrett,* 197 Ky. 17, 246 S.W. 455, 457 (1922).

tive branch has no power to monitor his testimony in any way. For the following reasons, although agreeing with Curd to the extent that his testimony was indeed within the judiciary's sphere of control, we cannot accept Curd's position.

Generally speaking, courts have sole control over the content, admissibility, and flow of testimony during trial. And, of course, cross-examination plays an important role in our adversarial system to test the witness's perception, memory, and narration. But it is important to remain mindful of the distinction between proper *admission* of testimony and misleading testimonial *content*. In our view, Curd mistakenly conflates these concepts.

The admission of evidence is wholly within the control of the trial court. All evidence and testimony must first meet the baseline relevancy requirement, outlined in Kentucky Rules of Evidence (KRE) 402. Various other rules control the admission of all manner of evidence throughout a trial.[15] The courts are also tasked with maintaining watch over the proper practice of cases and ensuring compliance with either the Kentucky Rules of Civil Procedure (CR) or the Kentucky Rules of Criminal Procedure (RCr), preserving fairness for all parties as a result. Particularly relevant to this case, before an expert may give an opinion at trial, the offering party must satisfy the *Daubert* test,[16] adopted by Kentucky in *Mitchell v. Commonwealth*.[17] In serving as the gatekeeper in the admission of opinion evidence under *Daubert*, a trial court is only entrusted with the responsibility of determining whether the expert opinion testimony based on "scientific, technical, or other specialized knowledge"[18] is relevant and reliable.

We highlight the court's role to illustrate clearly its contrast with the Board's role. The Board is not "substitut[ing] its judgment for that of the Court and its attorneys" as Curd argues, because beyond simple relevancy and reliability, the court and attorneys made no judgment on the content of Curd's testimony. The determination made by the court and attorneys, to the extent determinations were even made, went only to whether Curd was qualified as an expert to give opinion testimony not whether the opinion testimony he gave offended the professional ethical standards established for Kentucky-licensed land surveyors. Curd's testimony, regardless of whether it was misleading or factually incorrect, was relevant and reliable in the *Daubert* sense. Curd's position is that satisfying *Daubert* is enough to prohibit any agency action. But *Daubert* was not intended to serve the role Curd promotes, nor were courts for that matter.[19] In

---

15. The court's control is not limited to in-court proceedings. A court has inherent authority to respond to any improper actions occurring during depositions, discovery, negotiations, ex parte contacts, or other activities associated with a case pending before the court.

16. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

17. 908 S.W.2d 100 (Ky.1995), *overruled on other grounds by Fugate v. Commonwealth*, 993 S.W.2d 931 (Ky.1999).

18. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786 (emphasis omitted).

19. It remains a question whether *Daubert* even applies to the standard for expert testimony. *Daubert* was only "intended to keep juries from considering novel scientific theories[.]" Jennifer A. Turner, *Going After the 'Hired Guns': Is Improper Expert Witness Testimony Unprofessional Conduct or the Negligent Practice of Medicine?*, 33 Pepp.L.Rev. 275, 286 (January 2006). In relying on *Daubert*, courts are unable adequately to police expert testimony in at least three ways: (1) "judges may be unable to identify improper

truth, licensure boards or other professional agencies are well suited to ensure accurate expert testimony and in no way hamper an expert's ability to offer his opinion freely.

In *Austin v. Am. Ass'n of Neurological Surgeons,*[20] the Seventh Circuit highlighted well an agency's nuanced role when dealing with expert testimony. Unlike the instant case, *Austin* involved a private association rather than a state licensure board; but the policy principles are much the same.

The Board, in sanctioning Curd for his testimony, has an inherent interest that is much like the AANS in *Austin*. That is to say, the Board does not wish to allow Curd "to use his membership to dazzle judges and juries and deflect the close and skeptical scrutiny that shoddy testimony deserves."[21] The *Austin* court went on to illustrate why Curd's position is misguided:

> Judges are not experts in any field except law. Much escapes us, especially in a highly technical field, such as neurosurgery. When a member of a prestigious professional association makes representations not on their face absurd, such as that a majority of neurosurgeons believe that a particular type of mishap is invariably the result of surgical negligence, the judge may have no basis for

questioning the belief, even if the defendant's expert testifies to the contrary.[22] If the court—or attorneys for that matter—were able easily to understand the content of a witness's testimony and effectively prevent misleading statements, an expert witness would not be required. An expert is allowed when the subject matter of the testimony is beyond the factfinder's knowledge and experience. It seems illogical to rely solely on the court and *Daubert* to monitor whether highly specialized testimony is technically misleading.

Moreover, "[w]e doubt that [Curd] would embrace the converse of the rule for which he contends, and concede that if a judge rules that a proposed expert's testimony is inadmissible because irresponsible, that ruling is a proper predicate for professional discipline."[23] A judge cannot be, and is not expected to be, an expert in every profession. As is the case, a "judge's ruling that expert testimony is admissible should not be taken as conclusive evidence that it is responsible testimony."[24] The Board is not, in any measure, impinging on the proper role of the Judiciary. Rather, the Board is advancing the Judiciary's most prominent policy: the pursuit of the truth through forthright and credible testimony.

Outside of pure judicial enforcement, cross-examination operates—at least in

---

testimony, especially when the testimony involves highly complex [ ] issues"; (2) "only a handful of reported cases have discussed the admissibility of standard of care evidence, indicating judges are reluctant to exclude [ ] expert testimony under *Daubert* "; and (3) it remains "unclear whether *Daubert* applies to standard of care expert testimony, because the foundational inquiry for this testimony is whether the expert could have observed the custom, *not* whether the expert's opinion is reliable." *Id.* at 286–87 (emphasis added and internal citations omitted).

**20.** 253 F.3d 967 (7th Cir.2001).

**21.** *Id.* at 972.

**22.** *Id.* at 972–73. *See also,* Matthew Passen, *Professional Self Regulation or Witness Intimidation?,* Chi. Bar Ass'n Young Lawyers Journal, May 2008 ("Notwithstanding [a court's broad authority under *Daubert* ] to screen expert testimony, judges are unable to completely eliminate the problem of unethical medical expert testimony.").

**23.** *Id.* at 973.

**24.** *Id.*

theory—to expose potential deceptive statements or worse, falsehoods, through impeachment. Curd argues he was subject to extensive cross-examination and can only provide answers to the questions he is asked. Cross-examination, however, "seldom is of adequate value when thrust against the broadside of the litigation expert who can so gracefully stiff-arm his unprepared cross-examiner."[25] Perhaps especially in the context of expert testimony, cross-examination is rarely the silver bullet Curd describes it to be. There are two main reasons for this: (1) "the expert will probably know more about the scientific theories than the attorney[,] and the attorney may have insufficient resources to develop an effective cross-examination"[26]; and (2) "cross-examination may provide the expert with an opportunity to promote a theory detrimental to the cross-examining attorney's case."[27] Consequently, an expert witness's subjection to cross-examination does not necessarily guarantee that improper expert testimony will be exposed. And, again, it is simply difficult for the court to police expert testimony when it is not plainly erroneous.

■ Finally, the General Assembly has explicitly delegated authority to the Board to regulate the professions of engineering and land surveying.[28] Of course, a licensee does not cease being a licensee when he takes the witness stand in a trial proceeding. To the contrary, a valid professional license is often a key reason witnesses qualify as experts. At the very least, it cannot be argued that a licensed land surveyor does not project more reliability, credibility, or expertise than an unlicensed land surveyor. Indeed, the grant of the license imparts a degree of official sanction and serves as a demarcation between an amateur and a professional. Necessarily then, when the licensee appears under color of his license, whether testifying as a trial expert or performing a field survey, the Board has authority to police his conduct for any ethical missteps. To say otherwise would allow licensees to enjoy the benefits of their license, *e.g.*, enjoying near-automatic credibility when called as a witness, without conforming their conduct to the ethical norms of the profession.

Given the limitations of the judiciary and those limitations inherent in our adversarial system, it seems clear that licensure boards or professional agencies are better equipped to review expert testimony for any inaccuracies. In this context, the judiciary and the Board exist in a symbiotic relationship. The judiciary governs the admissibility of evidence and the qualifications of expert witnesses while the Board, on the other hand, operates to ensure that when a licensee appears in court as an expert witness, his testimony conforms to the ethical standards associated with his license. In the end, this relationship does

**25.** B. Sonny Bal, *The Expert Witness in Medical Malpractice Litigation*, 467 CLINICAL ORTHOPAEDICS AND RELATED RESEARCH 383, 386 (No. 2 Feb. 2009) (quoting *Rowe v. State Farm Mut. Auto. Ins. Co.*, 670 So.2d 718, 726 (La.App. 3rd Cir.)).

**26.** Turner, *supra* n. 95 at 288.

**27.** *Id.* at n. 96.

**28.** This delegation is not an impermissible delegation. *See Am. Beauty Homes Corp. v. Louisville & Jefferson Cnty. Planning and Zoning Comm'n.*, 379 S.W.2d 450, 455 (Ky.1964) ("Here obviously is a delegation of legislative power to an administrative agency (whether characterized as a part of the legislative or executive branch of the government) to be exercised in conformity with a legislative policy and in a discretionary manner in the light of prevailing local conditions. It calls for policy decisions by a body with specialized training and experience in this field. In no sense does the Commission perform a judicial function.").

*not* represent an example where the licensure board, *i.e.*, the Executive branch, is subsuming a role the Constitution has delegated to the Judicial branch. Instead, the licensure board is performing a role the Judicial branch is neither well adapted to perform nor capable of performing. The effect of this relationship will not be a chill on the candor of experts; but, instead, experts will testify consistently with their respective profession's ethical standards or risk having to defend their license in a disciplinary proceeding.

Pausing momentarily, we highlight the specificity of our holding today. In allowing licensure boards to police expert testimony, we do not provide a regulatory blank check. Our intention is not to unleash licensure boards to sanction testimony simply because it may not fit neatly within the current professional orthodoxy. As students of history, we are well aware of the problems that may arise when a regulatory body attempts to discredit a professional, or worse, sanction him for honest, forthright scientific opinion contrary to popular thought. Illustratively, Galileo, now lauded as the Father of Observational Astronomy, was persecuted as a heretic for championing heliocentrism, a view now undeniable. Pushing the envelope, so to say, in scientific theory often promotes advancement and perhaps enlightenment. We do not wish to stifle that; but we do, however, intend to permit licensure boards to discipline licensees behaving unethically. As we discuss below, licensure boards—along with the public—have a significant interest in discouraging testimony that either fails to be objective or is untruthful, scientific theory aside.

We seek only to point out that a licensee must comply with the licensee's profession's ethical guidelines, not that the only acceptable scientific methods are those approved by the profession.

## C. The Board's Decision may be Supported by Substantial Evidence, but the Statutes and Regulations the Board Relies on are Unconstitutionally Vague as Applied to Curd.

When reviewing agency action, it is well settled that we review whether the agency's decision is supported by substantial evidence and generally defer to the agency. But this case presents a slight wrinkle in the application of that review. Curd argues the statutes and regulations under which the Board sanctioned him are unconstitutionally vague as applied to him, and the Board counters by attempting to shift our focus to substantial-evidence review and avoid altogether any constitutional issues. To an extent, we agree with both parties.

At the heart of our review of agency decisions is arbitrariness. We inspect the agency's action to determine "whether the action was taken in excess of granted powers, whether affected parties were afforded procedural due process, and whether decisions were supported by substantial evidence."[29] We are not to "reinterpret or to reconsider the merits of the claim, nor to substitute [our] judgment for that of the agency[.]"[30] In situations such as instantly presented, when the "administrative agency acts in its capacity as a trier of the facts, we have held that the findings of the agency are conclusive if supported

---

**29.** *Sebastian–Voor Properties, LLC v. Lexington–Fayette Urban Cnty. Gov't,* 265 S.W.3d 190, 195 (Ky.2008) (citing *Am. Beauty Homes Corp. v. Louisville & Jefferson Cnty. Planning and Zoning Comm'n.,* 379 S.W.2d 450, 456 (Ky.1964)).

**30.** *Louisville/ Jefferson Cnty. Metro Gov't v. TDC Grp., LLC,* 283 S.W.3d 657, 663 (Ky. 2009).

by substantial evidence." [31] And we have defined *substantial evidence* as "evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable men." [32] Admittedly, this is largely a deferential standard of review.

 Substantial evidence is certainly more than adequate as a barometer of appropriate agency action. But relying solely on the existence of substantial evidence for the approval of agency action becomes a fallacy when the agency action is premised on unconstitutional footing.[33] Of course, we have a strong policy of avoiding constitutional questions unless absolutely necessary for the proper resolution of the case.[34] This is sound policy, but it is inapplicable here because the nature of Curd's claim requires the constitutional question be answered or risk tolerating arbitrary action.

The *agency's* perspective is the lens through which we conduct substantial-evidence review. Review of a statute's or regulation's constitutional specificity as applied, on the other hand, requires a determination from the *individual's* perspective; that is, substantial evidence focuses on the agency's review of the evidence, while vagueness-as-applied focuses instead on the individual's comprehension of the ramifications of his actions. Accordingly, simply to rest on a finding of substantial

evidence without ever entertaining the individual's challenge to the statute as applied to him would essentially allow punishment to stand without ever reviewing whether the individual was aware his conduct carried with it the potential for punishment.

Whether an agency's decision is based on substantial evidence has little to no bearing on the individual's claim that some or all of the statutes necessary for the agency's decision are, as applied to him, unconstitutional. Indeed, if a jury finds guilt beyond a reasonable doubt under a statute unconstitutionally vague as applied, we will overturn the conviction because the individual was not given fair notice his conduct was criminal. Such is the case with agency action based on an unconstitutionally vague statute or regulation as applied to a sanctioned licensee— the existence of substantial evidence is not a saving grace in such situations. The Board's reliance on substantial-evidence review in the present case is misguided.

 "Emanat[ing] from the due process provisions of the United States and Kentucky Constitutions[,]" [35] the void-for-vagueness doctrine targets the same ill as review of agency action: arbitrariness. Requiring a statute to provide "fair notice of prohibited conduct and contain reasonably clear guidelines[,]" thwarts "arbitrary and discriminatory enforcement." [36] More

---

**31.** *Kentucky State Racing Comm'n v. Fuller,* 481 S.W.2d 298, 307 (Ky.1972); *see also Taylor v. Coblin,* 461 S.W.2d 78, 80 (Ky.1970) ("If there is any substantial evidence to support the action of the administrative agency, it cannot be found to be arbitrary and will be sustained.").

**32.** *Fuller,* 481 S.W.2d at 308 (internal quotation marks omitted).

**33.** *See Ramirez v. Nietzel,* 424 S.W.3d 911, 917 (Ky.2014).

**34.** *See TDC Grp., LLC,* 283 S.W.3d at 665 ("Because this Court finds sufficient reason to affirm the Board's decision within the standard process of judicial review of an administrative agency's decision, the constitutional issue cannot be addressed.").

**35.** *Commonwealth v. Kash,* 967 S.W.2d 37, 42 (Ky.App.1997).

**36.** *Id.* (internal quotation marks and citations omitted) (quoting *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)); *see also Tobar v. Commonwealth,* 284

specifically, "[a] statute is unconstitutionally vague if those individuals who are affected by it cannot reasonably understand what the statute requires."[37]

■■■ Our strong presumption of a statute's constitutionality[38] allows a certain leeway for vagueness, despite perhaps "difficulty . . . in determining whether certain marginal offenses fall within [its] language."[39] Constitutional infirmity only arises when, "in the context of the particular conduct to which [the statute or regulation] is being applied[,]"[40] the statute or regulation is beyond comprehension. Essentially, the language of either the statute or regulation is "so vague and indefinite as really to be no rule or standard at all"[41] or "men of common intelligence must necessarily guess at its meaning and differ as to its application."[42] Broad in its scope, this standard applies when the statute or regulation "is not concerned with criminal con-

duct or first amendment considerations[.]"[43] We are unconvinced, however, that First Amendment concerns are wholly absent from Curd's action.

■■■ Expert witness opinion testimony has been given First Amendment protection in other contexts.[44] In our estimation, a licensee sanctioned for expert opinion testimony has a colorable First Amendment claim. The success of this claim may be unlikely because the government can regulate professional speech and has a strong interest in ensuring its accuracy.[45] Regardless, we cannot deny that First Amendment concerns are present here. As a result, we must look closer at the statutes in question because "a State may not, under the guise of prohibiting professional misconduct, . . . ignore constitutional rights."[46] Furthermore, "[b]road prophylactic rules in the area of free ex-

---

S.W.3d 133, 135 (Ky.2009) (outlining that to satisfy a vagueness challenge, a statute must: "1) provide fair notice to those targeted by the statute, 'by containing sufficient definiteness so that ordinary people can understand what conduct is prohibited' and 2) it must have been drafted in such a way to discourage arbitrary and discriminatory enforcement.' ").

37. *Tobar*, 284 S.W.3d at 135.

38. *See Cornelison v. Commonwealth*, 52 S.W.3d 570, 572 (Ky.2001) ("A statute will not be struck down as unconstitutional unless its violation of the constitution is clear, complete[,] and unequivocal.") (internal quotation marks and citations omitted); *Commonwealth v. Halsell*, 934 S.W.2d 552, 554–55 (Ky.1996)

39. *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

40. *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir.1983).

41. *Id.* (quoting *Exxon Corp. v. Busbee*, 644 F.2d 1030, 1033 (5th Cir.1981)).

42. *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

43. *Id.*

44. *See, e.g., Kinney v. Weaver*, 367 F.3d 337, 361–62 (5th Cir.2004) (performing *Pickering* analysis for public-employee testimony with two police officers giving expert opinion).

45. *See* Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U.L.Rev. 885 (Spring 2000). In his article, Kry summarized the development of professional speech under licensure regimes and noted the predominant "value-neutral test" requires two inquiries: (1) "Is the speech characteristic-dependent, in that the substance of the advisor's message depends on the recipient's circumstances?" and (2) "Is the speech delivered in the context of a person-to-person relationship, one in which the professional is communicating to a single person with whom he is directly acquainted?" *Id.* at 928.

46. *NAACP v. Button*, 371 U.S. 415, 439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

pression are suspect." [47] Allowing such broad rules could certainly result in a chilling effect on the candor of expert testimony.[48]

With that understanding in place, we now turn to the statutes and regulations applied to Curd by the Board. The Board found Curd violated the following statutes and regulations:

**KRS 322.180:** The board may refuse to issue, refuse to renew, suspend, or revoke a license, may reprimand, place on probation, or admonish a licensee, may impose a fine on a licensee not to exceed one thousand dollars ($1,000), or may impose any combination of these penalties when it finds that an applicant or licensee:

. . . .

(2) Engaged in gross negligence, incompetence, or misconduct in the practice of engineering or land surveying;

. . . .

(12) Engaged in conduct likely to deceive or defraud the public[.]

**201 KAR 18:142:**

**Section 2:** The engineer or land surveyor shall conduct his or her practice in order to protect the public health, safety, and welfare.

(1) The practice of professional engineering and land surveying is a privilege, and not a right.

(2) If a licensee's judgment is overruled and a licensee has reason to believe the public health, safety or welfare may be endangered, the licensee shall inform his or her employer or client of the possible consequences and, if not resolved, notify appropriate authorities.

**Section 3:** A licensee shall issue all professional communications and work products in an objective and truthful manner.

(1) A licensee shall be objective and truthful in all professional reports, statements or testimony and shall include all material facts.

(2) If serving as an expert or technical witness before any tribunal, a licensee shall express an opinion only if it is founded on adequate knowledge of the facts in issue, on the basis of technical competence in the subject matter, and upon honest conviction of the accuracy and propriety of that testimony, and shall act with objectivity and impartiality. A licensee shall not ignore or suppress a material fact.

**Section 9:** The professional engineer or professional land surveyor shall avoid conduct likely to discredit or reflect unfavorably upon the dignity or honor of his or her profession.

At the outset, it is our belief that the only 201 KAR 18:142 Section 3 is capable of passing constitutional muster in this context. A licensure board may regulate dishonest or unobjective testimony and certainly has a compelling interest in doing so. As applied to expert testimony, the remaining statutes and regulations convey "standards" that are not really standards at all.

Beginning with KRS 322.180(2) and (3)—our concerns regarding expert testimony being considered the "practice of land surveying" aside—we find that land surveyors of common intelligence would have to guess at the meaning of

**47.** *Id.*

**48.** *See* Matthew Passen, *Professional Self–Regulation or Witness Intimidation?*, Chi. Bar Ass'n Young Lawyers Journal 50, 54, May 2008 ("[P]laintiffs have a compelling argument that silencing a witness through unwarranted license revocation, or threats of such action, is a form of censorship proscribed by the First Amendment.").

"gross negligence" or "incompetence" or further, what is "likely to deceive the public" in this context. The evidence in this case indicates Curd's opinion was based on research and actual deed language. Of course, the Board argues his opinion was grossly negligent or incompetent because he had to ignore monumentation to reach his conclusion; but, while this may be true, without further indication of what constitutes gross negligence, incompetence, or misconduct, we remain unsure how *Curd* would grasp his testimony would subject him to sanction. And when a land surveyor testifies based on the research he performed, cites actual deed language, and acknowledges the proper role of monumentation in the context of surveying, it is difficult to perceive how he would expect to be sanctioned for deceiving the public.

█ Turning to 201 KAR 18:142, Section 2(1) and (2), we are unable to comprehend how Curd would expect his testimony would in any way impact the public health, safety, or welfare. The Board's argument that Curd's testimony violated the public health, safety, or welfare is far too attenuated. At oral argument, the Board attempted to characterize Curd's testimony as a cog in a wheel of deception: Curd testified dishonestly, was financially compensated for his testimony, caused the Denneys years of stress and thousands of dollars in expenses, and was an essential player in the "conspiracy" to deprive the Denneys of their land. What the Board fails to show, however, is how this impact on the Denneys relates to the endangerment of the public health, safety, or welfare. Regardless of Curd's testimony, the Southwoods' claim against the Denneys was a valid claim; and, as is the case with the initiation of any legal action, it can be financially burdensome to mount a defense.

█ Finally, 201 KAR 18:142, Section 9, asks a land surveyor to guess somehow at what testimony may bring dishonor to his profession. On its face, the regulation is not vague; but, when applied to expert testimony it is difficult to imagine what testimony does not bring about the potential for dishonor to the profession. Indeed, at least one disappointed party inheres in our adversarial system. In the context of expert opinion testimony, this regulation is rife with potential for arbitrary enforcement as a result of perhaps controversial or disagreeable testimony. In point of fact, Curd was sanctioned by the Board for his testimony regarding West's deed research. Like the parties, trial experts are often adversarial as well. Curd's criticism of West may have been unsettling to the Board; but we are hard-pressed to understand how Curd would anticipate dishonor to the profession of land surveying as a result of his criticism. Disagreement does not equal dishonor.

Again, the Board's recital of the hearing officer's findings is misguided. In reviewing whether Curd was sanctioned under statutes and regulations unconstitutionally vague as applied to him, we are not primarily concerned with whether the Board fully grasped the relevant language; rather, we are focused on whether Curd could have known his testimony could bring about disciplinary action. And the Board is similarly misguided in its assertion that because commonly understood language was used, neither the Board nor the General Assembly is required to promulgate standards with greater specificity. While generally it is true that common, plain language is sufficient for statutory or regulatory language, the use of that language does not render the statute or regulation equally applicable to all situations. Here, the Board's attempt to monitor expert testimony—an end we find acceptable—fails because the language is too broad when

applied to the conduct at issue. This, however, does not mean the Board must speak with impeccable precision in all situations.

 Before concluding, we must take up Curd's violation of 201 KAR 18:142, Section 3. Initially, it is important to point out that the regulation allows punishment for more than simply untruthful testimony. In the strict sense, Curd's testimony was not false;[49] but in the eyes of the Board, Curd's testimony was slanted to mislead the judge and was, therefore, contrary to the ethical standards required of land surveyors licensed in Kentucky. The Board's findings adequately support the conclusion that Curd's testimony failed to be objective, equally punishable under 201 KAR 18:142 Section 3. Essentially, Curd ignored proper land-surveying methodology in an attempt to support a desired result, *i.e.*, the land across the Eadsville Highway belonged to the Southwoods, not the Denneys. Misleading testimony is not objective testimony.

 In light of our deferential review, along with the simple volume of evidence produced by the Board, we cannot say that the Board's decision was not based on substantial evidence. The Board conducted a three-day hearing, called multiple witnesses, and submitted detailed proof. In the end, the hearing officer issued a finding based on sixty-four findings of fact and fifty-seven conclusions of law. It would defy common sense to say the Board's action was not supported by substantial evidence; certainly, the Board presented enough evidence to induce conviction in the minds of reasonable persons. We emphasize that the number of the hearing officer's findings, alone, does not compel our determination that substantial evidence exists. Rather than recite the copious findings, we merely note the number of findings as further indication that the evidence was indeed substantial.

 Although we may disagree with the result—perhaps strongly disagree—we cannot ignore the amount of evidence produced during Curd's hearing; and, of course, we must not substitute our judgment for the agency's. Furthermore, substantial evidence may still be found despite "the possibility of drawing two inconsistent conclusions from the evidence[.]"[50] So our disagreement with or consternation over the Board's action is largely irrelevant.

Because the Board did not provide insight into how the sanction was apportioned among the various violations found, we believe it appropriate to remand Curd's case to the Board for further review consistent with this opinion. Curd was initially held to be in violation of multiple statutes and regulations that have now been invalidated as applied to him in this case. We take no position on whether Curd's current sanction is appropriate for his violation of 201 KAR 18:142, Section 3; that determination we must leave to the Board.

### III. CONCLUSION.

This case, simply summed, articulates that licensees accept the benefits of licensure—namely, credibility and assumed expertise—but also must accept the responsibilities of holding a license. An expert called to offer professional opinion testimony may not espouse half-truths or make deceptive statements without risking the possibility of accountability to his professional licensing authority. Here, the Board's action, supported by substantial evidence, did not violate the separation of powers. A number of the statutes and

---

49. To be accurate, Curd's testimony regarding his active status as an investigator for the Board was false.

50. *Fuller*, 481 S.W.2d at 307.

regulations underlying Curd's sanction, however, are unconstitutionally vague as applied to his expert testimony. As a result, we remand the matter to the Board for reconsideration of Curd's sanction in light of this Opinion.

All sitting. All concur.